# IN THE UNITED STATES DISTRICT COURT`
# FOR THE EASTERN DISTRICT OF TEXAS
# MARSHALL DIVISION

| | |
|---|---|
| MHL TEK, LLC, § § Plaintiff, § § v. § § GENERAL MOTORS CORPORATION, ET AL., § § Defendants. § | CIVIL ACTION NO. 2:08-CV-0125 |

## MEMORANDUM OPINION AND ORDER

Defendants General Motors Corporation, Saturn Corporation, Ford Motor Company, Land Rover North America, Inc., Volvo Cars of North America, LLC, American Suzuki Motor Corporation, Mitsubishi Motors North America, Inc., American Honda Motor Co., Inc., Honda of America Manufacturing, Inc., and Honda Manufacturing of Alabama, LLC (collectively "Defendants") move the Court to Dismiss Claims One and Three of the First Amended Complaint filed by MHL TEK, LLC ("MHL"), on the grounds that MHL does not own the patents at issue in those counts and therefore lacks standing under Fed. R. Civ. P. 12(b)(1) to enforce them. (Dkt. No. 65). After carefully considering the parties' written submissions, the Court GRANTS defendants' motion for the reasons set forth in this opinion.

I.  **Background**

Plaintiffs MHL filed this patent infringement suit against various automobile manufacturers on March 24, 2008. In this action, the plaintiff alleges that tire monitoring systems manufactured and sold by the defendants infringe U.S. Patent Nos. 5,663,496 ("the '496

patent"), 5,731,516 ("the '516 patent"), and 5,741,966 ("the '966 patent"), all related to automobile tire monitoring systems.[1]

Michael Handfield and Helene Laliberte are named inventors on all three patents-in-suit. The two patents-in-issue in this motion, the '496 patent and the '966 patent are based on U.S. Patent Application No. 08/101,379 ("the '379 Application"), titled "A Method and System for Monitoring a Parameter of a Vehicle Tire," which was filed on August 3, 1993. The '379 application resulted in U.S. Patent No. 5,473,938 ("the '938 patent").[2] The '496 patent issued on September 2, 1997 based on a divisional application, U.S. Patent Application No. 08/466,219, filed on June 6, 1995. The '966 patent issued on April 21, 1998 based on a divisional application, U.S. Patent Application No. 08/465,763, filed on June 6, 1995. On August 5, 1993, the inventors assigned all rights in the inventions leading up to the '496 and the '966 patents to Animatronics, Inc. ("Animatronics"). The assignment was recorded with the U.S. Patent and Trademark Office ("PTO").

In 1993, Animatronics entered into a "development agreement" with McLaughlin Electronics ("ME") for the design and development of a tire pressure monitoring system ("TPMS"). Mr. Handfield signed the agreement on behalf of Animatronics. The Court has been presented with two substantially similar versions of the agreement, both dated March 1, 1993.

---

[1] A parallel action against other defendants based on claims of infringement of the same patents was previously filed in this Court. *See MHL TEK, LLC v. Nissan Motor Co., et al.*, Case No. 2:07-cv-289-TJW (hereinafter *MHL I*). Defendants from *MHL I* have previously filed motions to dismiss that case based on the same grounds as the present motion.

[2] The '938 patent is not in issue in this case. The PTO lists the status of this patent as "Expired Due to NonPayment of Maintenance Fees Under 37 CFR 1.362." *See* Patent Application Information Retrieval, http://portal.uspto.gov.

*See* Defs'Supp. Brief, Dkt. No. 163, Ex. B, C (hereinafter referred to as the "MHL" or "McLaughlin" "Development Agreement" respectively). On November 1, 1993, Mr. Handfield signed a separate document on behalf of Animatronics entitled "Assignment of Patent Rights." *See* Pltf's Sur-reply, Dkt. No. 118, Keane Aff., Ex. B (hereinafter "Patent Assignment"). Under the Development Agreement as well as the Patent Assignment document, Animatronics agreed to assign the patents issued for the TPMS to ME. On November 26, 2007, Animatronics assigned each of the patents-in-suit to MHL effective as of July 7, 2007.[3] Plaintiff has also presented to the Court another agreement between Animatronics and ME, also dated November 1, 1993. *See* Pltf's Sur-reply, Dkt. No. 118, Bruhn Aff., Ex. A (hereinafter "Potential Rescission Agreement"). Plaintiff contends this agreement allows for a possible rescission of the prior patent assignment.[4]

Defendants argue that under these agreements, Animatronics had previously assigned the the '496 and the '966 patents to ME. Defendants argue that any subsequent assignment by the inventors or by Animatronics to MHL did not transfer any rights in these two patents to plaintiff MHL. Therefore, they argue, this Court should dismiss the two claims involving the two patents at issue for lack of subject matter jurisdiction. Plaintiff contends that the assignment of the patents to ME was either void or later rescinded, effectively returning ownership to Animatronics. Alternatively, they argue that the original agreement carved the '496 and the '966

---

[3] Both Animatronics and MHL are owned and controlled by the inventors Mr. Handfield and Ms. Laliberte.

[4] The court notes that this agreement is signed by John T. McLaughlin as President of ME, whereas the Patent Assignment document executed the same day is signed by Eleanor L. Jenkins, Secretary for ME.

patents out of the assignment to ME. In any case, plaintiff contends that MHL now has standing to assert the '496 patent and the '966 patent against defendants.

## II. Discussion

Federal Rule of Civil Procedure 12(b)(1) is the procedural mechanism for challenging a court's subject matter jurisdiction. *See Ramming v. U.S.*, 281 F.3d 158, 161 (5th Cir. 2001). "Lack of subject matter jurisdiction may be found in any one of three instances: (1) the complaint alone; (2) the complaint supplemented by undisputed facts evidenced in the record; or (3) the complaint supplemented by undisputed facts plus the court's resolution of disputed facts." *Id*. The party asserting jurisdiction bears the burden of proof. *Id*. "The burden of demonstrating standing falls to [the plaintiff], as '[i]t is well established . . . that before a federal court can consider the merits of a legal claim, the person seeking to invoke the jurisdiction of the court must establish the requisite standing to sue.'" *Ortho Pharm. Corp. v. Genetics Inst., Inc.*, 52 F.3d 1026 (Fed. Cir. 1995) (quoting *Whitmore v. Arkansas*, 495 U.S. 149, 154 (1990); citing *Sicom Sys., Ltd. v. Agilent Tech., Inc.*, 427 F.3d 971, 975-76 (Fed. Cir. 2005)); *see also Voda v. Cordis Corp*., 476 F.3d 887, 892 (Fed. Cir. 2007). "In examining a Rule 12(b)(1) motion, the court is empowered to consider matters of fact which may be in dispute." *Id.* at 161. Conversely, undisputed facts present in the record are accepted as true. *Id*. When jurisdiction rests on a disputed factual issue, however, the court reviews the parties' submitted evidentiary materials, and the plaintiff must prove that the facts supporting subject matter jurisdiction are true by a preponderance of the evidence. *Paterson v. Weinberger*, 644 F.2d 521, 523 (5th Cir. 1981).

The Patent Act provides that a "patentee" shall have remedy by civil action for patent infringement. 35 U.S.C. § 281 (1994). A plaintiff seeking damages for infringement of a patent must hold legal title to that patent. *See*, *e.g.*, *Rite-Hite Corp. v. Kelley Co., Inc.*, 56 F.3d 1538 (Fed.Cir.1995); *Speedplay, Inc. v. Bebop*, 211 F.3d 1245, 1249-50 (Fed. Cir. 2000) (citing 35 U.S.C. §§ 100(d), 261, 281). A party without title has no standing to bring suit. *Filmtec Corp. v. Allied-Signal Inc.*, 939 F.2d 1568 (Fed. Cir. 1991); *Abbott Labs. v. Diamedix Corp.*, 47 F.3d 1128, 1131 (Fed. Cir. 1995) ("The right to sue for infringement is ordinarily an incident of legal title to the patent."). "Where one co-owner possesses an undivided part of the entire patent, that joint owner must join all the other co-owners to establish standing." *Isreal Bio-Engineering Project v. Amgen, Inc.*, 475 F.3d 1256, 1264 (Fed. Cir. 2007). Legal title, which confers standing, must be held at the inception of the lawsuit. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 570 n. 5 (1992) (plurality opinion)). Section 100(d) provides that a "'patentee' includes not only the patentee to whom the patent was issued but also the successor in title to the patentee." 35 U.S.C. § 100(d).

Initial ownership of a patent vests in the inventor by operation of law. *See Regents of University of New Mexico v. Knight*, 321 F.3d 1111, 1118 (Fed. Cir. 2003); *Bellehumeur v. Bonnett*, 127 Fed. Appx. 480, 484 (Fed. Cir. 2005). Section 261 of the Patent Code, however, provides that inventors can assign all or part of their interest in a patent and imposes minimal requirements for such assignment. *Id.* Under Section 261:

> Applications for patent, patents, or any interest therein, shall be assignable in law by an instrument in writing. The applicant, patentee, or his assigns or legal representatives may in like manner grant and convey an exclusive right under his application for patent, or patents, to the whole or any specified part of the United States. . . .

35 U.S.C. § 261.

When determining ownership of a patent in the context of a contract or agreement, state law governs. *Akazawa v. Link New Tech. Int'l, Inc.*, 520 F.3d 1354, 1357 (Fed. Cir. 2008); *Jim Arnold Corp. v. Hydrotech Systems, Inc.*, 109 F.3d 1567, 1578-79 (Fed. Cir. 1997). Moreover, "[c]onstruction of patent assignment agreements is a matter of state contract law." *Mars, Inc. v. Coin Acceptors, Inc.*, 527 F.3d 1359, 2008 WL 2229783, at *9 (Fed. Cir. 2008). In *Jim Arnold*, the Federal Circuit held that "when the infringement suit involves an assignment, unless the assignment may be declared null and void by operation of law-either through a forfeiture provision present in the agreement or under a provision of applicable state law-an assignor suing for infringement must first affirmatively seek equitable relief from a court to rescind or cancel the assignment." *Jim Arnold Corp.*, 527 F.3d at 1578. Since Animatronics failed to previously obtain a rescission from another court on its patent assignment to ME, this Court must determine if the assignment is void or rescinded based on the operation of law or some provision in the agreements between those two parties. In determining contract issues related to ownership of the patents-in-suit here, Michigan law, which is the choice of law based on the place of execution of the patent assignment agreement, governs the analysis. *Teas v. Kimball*, 257 F.2d 817, 823 (5th Cir. 1958); Fan Decl. Ex. 5A, Dkt. No. 65-11, at 1.

Animatronics entered the development agreement with ME with a clear intent to assign any patents issued for the TPMS to ME. As noted above there are at least two version of the development agreement before the Court. The version of the agreement that was initially filed by the plaintiff in its response includes a condition precedent to the assignment. *See MHL Development Agreement*, ¶8f ("Patents issued for the TPMS will be the property of

6

MCLAUGHLIN ELECTRONICS when all financial obligations to Animatronics will have been paid."). However, a version of the agreement most recently filed by the defendants omits such language.[5] *See McLaughlin Development Agreement*, ¶8f ("Patents issued for the TPMS will be the property of MCLAUGHLIN ELECTRONICS.").[6] Defendants argue that of the two versions, McLaughlin's embodies the final agreement. They argue MHL's version appears incomplete and riddled with incorrect spelling, improper formatting and missing sections. Further, defendants point out later documents quote the McLaughlin version of the agreement rather than MHL's version. Given the fact that neither Mike Handfield nor Gerry McLaughlin can authenticate either of these versions as the final agreement, defendants contend MHL has failed to show that the agreement included a financial condition precedent to the assignment. The Court agrees. Furthermore, the McLaughlin version is consistent with the Patent Assignment document later executed between Animatronics and ME. Under the terms of Section 2 of the Patent Assignment, Animatronics assigned to McLaughlin, its patent rights in all the inventions disclosed in the '379 Application. *See Patent Assignment*, ¶2 ("Animatronics does hereby assign to McLaughlin, . . . the entire right, title and interest, domestic and foreign, in and to the inventions and discoveries set forth in the Patent Application . . . .").[7] The document makes clear that the assignment was being done in accordance with the prior "Development Agreement" and in consideration of "one dollar and other valuable consideration." *See Patent Assignment*, at p. 1

---

[5] This version of the agreement was received by defendants from the law firm of Kelly, Lowrey & Kelley, LLP, a firm representing McLaughlin Enterprises, Inc. ("MEI"). *See* Sommer Decl., Dkt. No. 163-2, at ¶ 4. It is undisputed that ME is a wholly owned subsidiary of MEI. It is also undisputed that ME remains a suspended California corporation as of November 29, 2007.

[6] Similarly, the financial condition precedent to ownership of patent rights is missing in McLaughlin version. *See Development Agreement*, at p.2, Intent, ¶E.

[7] Animatronics did reserve rights related to its proprietary inventions. *See Patent Assignment*, ¶3.

("WHEREAS, in accordance with the Development Agreement, Animatronics desires to assign certain patent rights to McLaughlin.").

MHL repeatedly insists that the Court read in the intent of the parties as being that the assignment would not occur until all of ME's obligations under the Development Agreement were fulfilled.[8] MHL contends that it is undisputed that ME failed to comply with its financial obligations under the Development Agreement.[9] Therefore, it argues, the 1993 assignment is void. However, this would be in direct contradiction of the letter of the Development Agreement as well as the Patent Assignment. Here, the Court can find no express condition that needs to be fulfilled for the assignment to be completed.[10] *See Vaupel Textilmaschinen KG v. Meccanica Euro Italia S.P.A.*, 944 F.2d 870, 875 (Fed. Cir. 1991) ("An assignment of a patent 'may be either absolute, or by way of mortgage and liable to be defeated by non-performance of a condition subsequent.'"). The Court is not persuaded that any failure by ME to perform under the Development Agreement would render the assignment invalid. Under the contracted terms, the parties clearly intended for title to all "patents issued for the TPMS" to pass to ME upon

---

[8] As evidence of this intent, MHL points the Court to the "Intent" section of the Development Agreement. Paragraph E states: "When performance under this agreement is completed, MCLAUGHLIN ELECTRONICS will own, or hold the royalty free license to use any patents issued, upon which TPMS depends." *See Development Agreement*, Intent, ¶E.

[9] In her declaration in support of defendants' reply, Carol McLaughlin, Dr. McLaughlin's daughter, avers that "during the course of this [TPMS] development, McLaughlin Electronics made a series of payments to Animatronics. Those payments totaled over one million dollars." *See* McLaughlin Decl., Dkt. No. 103-2, at ¶ 9. Having found the lack of a condition precedent to the assignment here, the Court finds no need to determine whether ME rendered performance under the contract. As discussed below, ME's failure to pay Animatronics the full amount due under the agreement, even if true, does not automatically revoke the assignment of the patents therein.

[10] As for Paragraph E of the "Intent" section, the Court does not read this as clear intent of the parties to condition the express assignment made in ¶8f of the Agreement. *See Development Agreement*, ¶E, ¶8f. It simply shows that the parties intended that ME would be unencumbered in its use of any patented technology that related to the TPMS, regardless of whether those patents covered Animatronics proprietary technologies. *See generally* ¶8.

execution of the development agreement, as well as the patent assignment agreement. *See Israel Bio-Eng'g Project v. Amgen Inc.*, 475 F.3d 1256, 1265 (Fed. Cir. 2007) ("In construing the substance of the assignment, a court must carefully consider the intention of the parties and the language of the grant."). As much as MHL wants this Court to do so, the Court cannot now rewrite the parties' contracts.

Similarly unavailing is MHL's argument that even if the 1993 assignment were valid, it was rescinded by the parties in 1997. Plaintiff contends that in 1997, a dispute arose between Animatronics and ME due to ME's failure to make payments under the Development Agreement. There is no evidence of a written rescission of the patent assignment or a separate assignment of the patent from ME back to Animatronics. Defendants argue that § 261 requires that the recession of any patent assignment be in writing. While not speaking to recessions, § 261 provides that "[a]pplications for patent, patents, or any interest therein, shall be assignable in law by an instrument in writing." 35 U.S.C. § 261. Federal Circuit case law lends support to defendants' argument. *See Enzo Apa & Son, Inc. v. Geapag A.G.*, 134 F.3d 1090, 1094 (Fed. Cir.1998) (holding that although a valid patent license may be written, verbal, or implied, an assignment that would allow the assignee to assert standing must be in writing).[11] MHL however argues that Michigan and California contract law[12] allows for a contract to be varied or rescinded by the oral agreement of the parties even though the contract is embodied in a written instrument.

---

[11] The Federal Circuit denied an invitation to stray from the writing requirement, reasoning that "[p]arties would be free to engage in revisionist history, circumventing the certainty provided by the writing requirement of section 261 by claiming to be patentee by virtue of a verbal licensing arrangement." *Id*.

[12] Based on the fact that ME is a California corporation, MHL cites repeatedly to California law. However, it contends that the relevant law of mutual rescission is the same under California and Michigan law. *See* Pltf's response, at 11, n.6. As noted above, the Court applies Michigan contract law here.

*See* Pltf's response, at 11 (citing 13-71 CORBIN ON CONTRACTS § 71.2 (2008); *Fanucchi & Limi Farms v. United Agri Prods.*, 414 F.3d 1075, 1082 (9th Cir. 2005)). Nevertheless, Michigan law is fairly clear that no recession can occur absent a meeting of the minds. *See Hy King Assocs., Inc. v. Versatech Mfg. Indus., Inc.*, 826 F. Supp. 231, 240 (E.D. Mich. 1993) (citing *Universal Leaseway Sys., Inc. v. Herrud & Co.*, 115 N.W.2d 294, 297 (Mich. 1962)) ("In Michigan, it is basic and fundamental contract law that there must be a meeting of the minds not only to make a contract but also to rescind or modify a contract after it has been made.").

MHL relies largely on the declaration of Mr. Gerry McLaughlin, a former employee of ME, who represented himself as the sole surviving shareholder of ME and declared to this Court that ME had rescinded any assignment of any patent rights made by Animatronics to ME. *See* G. McLaughlin Decl., Dkt. No. 89-15 at 2. However, during his recent deposition, Mr. McLaughlin conceded that he is neither the last living shareholder of ME,[13] nor can he testify to any specific instance of a rescission of the assignment by the sole owner of ME, John McLaughlin.[14] The Court finds no disavowal of interest by ME with regard to the assigned patents rights. *Cf. IpVenture, Inc. v. Prostar Computer, Inc.*, 503 F.3d 1324, 1327 (Fed. Cir. 2007) (vacating dismissal for lack of standing where a third-party potential assignee had executed an express

---

[13] The Court notes that Mr. McLaughlin has testified that he never received any shares of ME, he "never had ownership of anything," and therefore, he cannot be the last living shareholder of ME. *See* G. McLaughlin Tr. at 294:5-7, 316:17-22, 321:12-22, Sommer Decl., Ex. A, Dkt. No. 163-3. Mr. McLaughlin has also filed a subsequent declaration, retracting his earlier claim. *See* G. McLaughlin Decl., Dkt. No. 118-9 at 2. It now seems to be undisputed that Mr. McLaughlin had no interest in ME.

[14] Mr. McLaughlin has now testified that he believes that Dr. John McLaughlin, the sole documented owner of ME, never agreed to sign a settlement "letter" that had been proposed by him and Honey Jenkins to Dr. McLaughlin. *See* G. McLaughlin Tr. at 341:1-9. Although multiple versions of this "settlement letter" have been presented to the Court, MHL claims that the final version of the letter presented to Dr. John McLaughlin would have acknowledged that ME had no rights in the patents related to TPMS. Defendants' most recent brief on its motion to dismiss focuses on highlighting the

written disavowal of any interest in the patent that the plaintiff-patentee had previously "agreed to assign," but had yet to "implement [the agreement] by written assignment").

MHL also contends that letters exchanged between Mr. Handfield, on behalf of Animatronics, and ME employees,[15] demonstrate such a meeting of the minds, thereby effecting a rescission by mutual consent of the 1993 assignment. As proof of conduct conforming to such an understanding between the parties, MHL points to a proposed agreement that it contends ME sent to Animatronics in August of 1997, containing a second assignment of the same TPMS patents. It also contends that later in November of 1997, ME proposed a settlement wherein it would pay Animatronics via an IOU, again for an assignment of the same patents. According to MHL, ME would not have made such offers if there was no mutual understanding between the parties that any prior assignment had been rescinded. The evidence that MHL directs the Court to does not however lead it to the inference that MHL desires. As explained below, all that these documents evidence is the existence of disputes and attempts by Animatronics and ME to resolve these disputes between them. The November 1997 communication, for instance, that plaintiff relies so heavily upon to prove mutual consent at best shows that Mr. Handfield attempted to obtain ME's acknowledgement that a recession had occurred, but failed in doing so. The initial letter written by Gerry McLaughlin and Honey Jenkins to Animatronics in November of 1997 outlines the state of the relationship of the two parties. It states that if the pending dispute was not resolved soon, the parties were headed to litigation. *See* Letter, Decl. G. McLaughlin, Ex. C., Dkt. No. 89-18. The attachment included with this letter, that is purported to have been a formal

---

inconsistencies between Mr. McLaughlin's affidavits and his deposition testimony. *See* Defs' Brief, Dkt. No. 163.

[15] The two MHL employees involved in these communications were Ms. Honey Jenkins,

version of the letter from ME to Animatronics, notes that "various versions of the 'Settlement Agreement'" had been proposed in attempts to resolve the dispute, and even at the time of the writing, "the Settlement Agreement" had not been finalized. *Id.* It indicates that there existed "internal misunderstanding regarding what [ME's] vision [was] with respect to the Settlement Agreement." *Id.* Other than Gerry McLaughlin's conflicting declarations and unreliable testimony, there is no evidence that Dr. John McLaughlin, the sole shareholder of ME, ever authorized any of the statements made in either of those letters, or agreed to acknowledge to Animatronics, a recession of the prior assignment of patent rights.[16] As for communications made by Gerry McLaughlin and Honey Jenkins, the Court agrees with the defendants that under the evidence presented, it is quite clear that they did not have the authority to bind ME to a rescission of the assignment or the settlement being pursued, and Animatronics was well aware of this.[17] *Cf. Eerdmans v. Maki*, 573 N.W.2d 329, 364-65 (Mich. App. 1997).

As further proof of a clear mutual understanding on the assignment issue, MHL relies on Mr. Handfield's own November 10, 1997 letter to Art Jones, counsel for ME. However, contrary to what MHL wants the Court to believe, in that letter, Handfield notes that Al Phillips, in a prior

---

Secretary of the company, and Mr. Gerry McLaughlin, Chief Engineer of the company.

[16] The May 14, 1997 letter from Art Jones to Handfield also falls short being the express relinquishment of patent rights by ME that MHL would like to be. First, it is not clear that Jones is referring specifically to the previously assigned patent rights rather than other related patents that the TPMS depends on. Nevertheless, Jones does not in any way seem to indicate a recession of a prior assignment, but rather seems to be expressing his concern about ensuring assignments of any derivative patent applications to ME. *See* Dkt. No. 169, Keane Decl., Ex. A at 4.

[17] The court is also not persuaded by MHL's argument that Jenkins signature, as Secretary for ME, on the Patent Assignment document, must imply her authority to bind ME. MHL contends if Jenkins did not have authority to sign that Assignment, then the Assignment itself is invalid. This argument is rejected. It is Handfield's signature on the Patent Assignment document that makes the assignment binding on Animatronics. *Cf. Banks v. Unisys Corp.*, 228 F.3d 1357, 1360 (Fed. Cir. 2000) (finding that a contract to assign inventive rights was not formed where employee had failed to sign the assignment agreements). More importantly, the Development Agreement, embodying virtually the same

letter on behalf of ME, had made the claim that "ME [was] not in default because he saw 'nothing in the [development] agreement that cast the payment timing in stone, as the provisions allowed the schedule to be advanced or delayed depending up the development progress.'"[18] *See* Handfield Decl. Ex. C, Dkt. No. 89-8, at 2. Aside from all the evidence that has been offered by MHL that demonstrates Animatronic's perspective on the state of affairs, there is little reliable evidence on how ME viewed the situation.[19] It bears mention that Dr. McLaughlin's refusal to sign the "letter" and acknowledgment cuts against MHL's arguments.[20] There is no persuasive evidence as to what may have occurred between the parties following Dr. John McLaughlin's refusal to sign the "letter."[21] MHL argues that the Court must look to the fact that ME subsequently pursued TPMS development and a related patent independently of Animatronics as

---

assignment had been previously signed by Dr. John T. McLaughlin, as President of ME.

[18] In the same letter, Mr. Handfield at one point acknowledges that a patent assignment continues to be valid. *Id.* ("The Development Agreement provides that patents . . . would be property of ME . . . ."). Later, in the letter, Mr. Handfield once more acknowledges that an assignment has already occurred, although this time contesting its validity. *Id.* at 3 ("Presently, ME and the defunct Development Agreement, have no rights to any of Animatronics technologies, patents and even the assignment to the patent 5,473,938 that was done under false pretence from ME."). Even in this context, Mr. Handfield's statements do not indicate "a mutual understanding" between the parties on the status of the assignment. Mr. Handfield appears, at this point, to be urging ME to sign, towards resolving the dispute, a "Restated Development Agreement and Manufacturing Agreement that were given to Honey several years ago," which apparently ME did not agree to. *Id.* ("You have stated that those proposals were full of 'legalese' and would need to be revised.")

[19] Defendants have repeatedly pointed out that the letters sent by Gerry McLauglin and Honey Jenkins to Mike Handfield do not appear to reflect ME's chairman's position on the situation. Arguably, it demonstrates unauthorized dealings by the two, driven mostly by their self-interest. *See also MHL I*, Sommer Decl., Ex. C, D, E, Dkt. No. 258.

[20] Based on unauthorized communications in May and July of 1997, between Honey Jenkins, Gerry McLaughlin and Mike Handfield, it appears that Dr. McLaughlin fully intended to pay Animatronics its due under the Development Agreement. *See MHL I*, Sommer Decl., Ex. C, E, Dkt. No. 257.

[21]Mr. McLaughlin has testified that he left ME in 1997 or 1998, when "the whole Development Agreement and everything came to a halt." *See* G. McLaughlin Tr. at 39:18-22. Therefore, he cannot possibly testify about anything that may have occurred between those parties after that time. In his declaration, Mr. McLaughlin simply avers that no settlement agreement was ever reached between ME and Animatronics, and it is his understanding that ME did not have any ownership interest in any of the

evidence that it did not believe it owned the '496 and '966 patents. The Court is not convinced that there is any evidence to support the inference that ME's conduct was driven by such an understanding.[22] Similarly, the fact that Animatronics paid maintenance fees for the two patents is irrelevant to MHL's "mutual consent" argument.

In its sur-reply to defendants' motion, MHL presented to the Court the Potential Rescission Agreement that was executed between Animatronics and ME concurrently with the Patent Assignment in November of 1993. MHL argues that under the evidence presented along with this agreement, the title to the patents-in-issue automatically reverted back Animatronics following ME's default on the Development Agreement. The specific clause that MHL points to states:

> In the event the terms and conditions set forth in the Development Agreement that require Animatronics to execute and deliver the Patent Assignment to McLaughlin are not satisfied, then McLaughlin agrees that it will execute and deliver to Animatronics any and all assignments or other documents or other documents in any and all countries and perform any and all acts which Animatronics, its successors, assigns or other legal representatives may deem necessary to cause a rescission of the Patent Assignment.

*Potential Rescission Agreement*, at 2. Undeniably, this is not an express forfeiture provision that automatically reverts title back to Animatronics upon ME's default, but rather provides for a rescission to be "caused." *See, e.g., Morris v. Acer Am. Corp.*, No. 2:08-cv-00127-TJW-CE, Dkt #138, at 8-9 (E.D. Tex. Mar. 11, 2009) (recommending that this Court deny a motion to dismiss where an express forfeiture clause was included in the assignment contract and the assignee had defaulted on the contract). MHL contends that in the face of the "mutual agreement" on

---

patents related to TPMS.

[22] The Court notes that the patent awarded to Dr. John McLaughlin, U.S. Patent No. 6,243,007, lists as cited references the '938 patent as well as the '496 patent, and was obviously was granted by the PTO as novel over those prior patents.

recession between ME and Animatronics, Animatronics did not deem it necessary to execute a recession of the patent assignment or new assignment back to itself. Because the Court has previously found a lack of agreement between the parties on recession, this agreement is of no help to the plaintiff. To the contrary, this agreement suggests that the parties understood that ME would need to execute new documents to return title to the patents back to Animatronics, and here ME simply covenants to cooperate in execution of such assignments – but only in the event that it is convinced that the terms and conditions set forth in Development Agreement are not satisfied. As defendants point out, Animatronics has had more than 15 years to invoke this clause against ME, but there is no evidence of any recession document ever being executed.

MHL next argues that even if the contracting parties did not agree to rescind the patent assignment, the original assignment carved the '496 and '966 patents out of the scope of the assignment. Both the Development Agreement as well as Patent Assignment document restrict the scope of the assigned patent rights to exclude "Animatronics' Proprietary Inventions." *See McLaughlin Development Agreement*, ¶8f; *Patent Assignment*, ¶3. MHL's argument here is that because the '496 and '966 patents incorporate Animatronics' Proprietary Inventions, rights to these patents are included in the rights carved out of the assignment. The Court notes that the Development Agreement phrases the assignment in terms of the TPMS. *See McLaughlin Development Agreement*, ¶8f ("Patents issued for the TPMS will be the property of MCLAUGHLIN ELECTRONICS."). The only reservation made by Animatronics is with regard to "Patents for the individual components of the TPMS." *Id.* Similarly, under the "Reserved Rights" section of the Patent Assignment document, the parties agree that there are three different "Animatronics Proprietary Inventions," and the assignment shall not cover those

inventions. *See Patent Assignment* at ¶3. MHL argues that because each of these Animatronics Inventions is more than just a "component," the carve-out language must be read to include entire systems and methods such as those claimed in the 496 and '966 patents. And even though the agreement relates to "patents issued for the TPMS," MHL urges the Court to ignore the fact the '496 and '966 patents are directed to an "overall" TPMS.[23] The Court rejects this position. As defendants point out, MHL's reading of the Reserved Rights as covering anything that "related to" or "concerned with" the Animatronics Proprietary Inventions would effectively reserve Animatronics' rights to all patents that cover a TPMS, including the '938 patent, thereby nullifying the entire assignment from which rights are reserved.[24] *McCoy v. Meridian Auto. Sys.*, 390 F.3d 417, 422 (6th Cir. 2004) (stating that courts should construe terms "so as to render none nugatory and avoid illusory promises."). MHL improperly reads restrictions from the first sentence of ¶3 that simply states the fact that the assigned patent application includes claims relating to Animatronics' inventions.

Further, applications for both the '496 and '966 patents were filed in June of 1995, well before the dispute arose between the Animatronics and ME, and while Animatronics was continuing to work on the development of the TPMS for ME.[25] Long after filing these applications, in his November 10, 1997 letter to Art Jones, Mike Handfield reiterated that "[t]he Development Agreement provides that patents that relate solely to the TPMS 3000 would be the

---

[23] As noted earlier, both patent applications were divisionals of the '379 Application.
[24] MHL cites as an example of system, the "communication link" in the TPMS. However, defendants point out that the Patent Assignment defines TPMS as comprising the communications link, thereby demonstrating the contracting parties' understanding of it as a component of the TPMS on which the patent assignment was based.
[25] As evidence of the parties' intent, defendants direct the Court to foreign patent applications filed in 1994 for inventions identical to those in the '496 and '966 patents. *See, e.g.,* Fan Decl. Ex. 7,

property of ME." *See* Handfield Decl. Ex. C, Dkt. No. 89-8, at 2. In this letter, Mr. Handfield clearly differentiated any Animatronics Technology patents that had "applications other than the TPMS 3000" as property of Animatronics. *Id*. He did not differentiate the two patents-in-suit as not related to the TPMS 3000. Therefore, the Court concludes that the carve-out provisions in the Development Agreement and the Patent Assignment did not retain rights in the '496 patent and the '966 patent for Animatronics to pass on to MHL.

## III. Conclusion

In considering the complaint supplemented by undisputed facts plus the court's own resolution of disputed facts, the Court concludes that plaintiff has failed to meet its burden of proof regarding standing. The Court has considered the gamut of evidentiary materials submitted by both parties to find that plaintiff has failed to show by a preponderance of the evidence that Animatronics retained title to the two patents-in-suit and passed it on to MHL. A party without title has no standing to bring suit. The court, therefore, GRANTS defendants' motion to dismiss plaintiff's claims related to the '496 and '966 patents.

SIGNED this 31st day of March, 2009.

*T. John Ward*
T. JOHN WARD
UNITED STATES DISTRICT JUDGE

---

Dkt. No. 65-13. The applications list ME as the owner. Plaintiff contends this was a clerical error.